Jorge **ESCALANTE,** Appellant,

v.

**D.D. LUCKIE and Harry K. Myers, Jr., Appellees.**

**No. 11–01–00014–CV.**

Court of Appeals of Texas, Eastland.

May 9, 2002.

Rehearing Overruled June 27, 2002.

J. Mark Chevallier, Jeffrey R. Sandberg, McGuire, Craddock & Strother, Dallas, for Appellant.

Kent F. Brooks, Law Office of Kent F. Brooks, Randall C. Reed, Weiner Glass & Reed, Attorneys At Law, Michael L. Jones, Henry & Jones, Attorneys At Law, Timothy A. Duffy, Burleson Pate & Gibson, Attorneys At Law, Dallas, for Appellees.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

## Opinion

TERRY McCALL, Justice.

Jorge Escalante is the holder of two promissory notes by American Teletronics, Inc. (ATI) to MainBank and a third promissory note by Bent Tree Group, Inc. (Bent Tree) to MainBank. Escalante had pledged certificates of deposit to MainBank as additional security to facilitate the loans from MainBank to ATI and Bent Tree. ATI and Bent Tree failed to pay the notes, and MainBank forced Escalante to liquidate his pledged CDs and pay the proceeds to MainBank. MainBank endorsed all three notes to Escalante. Escalante sued ATI and Bent Tree, as makers, and four individuals, John N. Stogner, Dal McKinney, D.D. Luckie, and Harry K. Myers, Jr., as guarantors. After a bench trial, the trial court entered a default judgment against ATI, Bent Tree, and McKinney; entered an agreed judgment against Stogner; and entered a judgment in favor of Luckie and Myers. Luckie and Myers presented no evidence during the trial. We affirm in part, reverse and render in part, and reverse and remand in part.

Escalante asserts that there is no evidence to support the trial court's judgment or, in the alternative, that the trial court's judgment is against the great weight and preponderance of the evidence. Escalante argues that the trial court erred because: (1) the guarantees and the underlying notes were admitted into evidence; (2) Es-

calante proved that he is the owner and holder of the guarantees of the August 24, 1998, note (Note 2) executed by Myers and Luckie; (3) Escalante proved that the $274,511.06 CD dated August 20, 1997, was the subject of the Luckie and Myers guarantees and that the CD was lost or forfeited; (4) Escalante proved the amount of money advanced on the line of credit note and the amounts due under the three notes; and (5) Escalante proved that he was obligated to MainBank for payment of the $150,000.00 note (Note 3).

## Standard of Review

The trial court expressly found that Escalante failed to prove certain elements of his claims against Luckie and Myers. An appellate court liberally construes the issues on appeal in order to obtain a just, fair, and equitable adjudication of the rights of the litigants. We look not only at the wording of the issues but also to the argument under each point to determine the intent of the party. *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex.1982). Although his issues on appeal are not stated in terms of legal and factual sufficiency challenges, we find that Escalante has raised both legal and factual insufficiency points.

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, appellant must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chemical Company v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242. Because he had the burden of proof

at trial, Escalante must demonstrate on appeal either: (1) that he established each element as a matter of law or (2) that the trial court's finding as to the failure of proof of the element was against the great weight and preponderance of the evidence. *Williford Energy Company v. Submergible Cable Services, Inc.*, 895 S.W.2d 379, 383–84 (Tex.App.-Amarillo 1994, no writ).

## Note 1—$500,000.00 Revolving Line of Credit

Myers, as chairman, and Luckie, as secretary, on behalf of ATI executed Note 1 to MainBank. Note 1 was dated August 20, 1997, and was a $500,000.00 revolving line of credit. On its face, Note 1 stated that it was a renewal of a prior note. The first paragraph of the note reads:

For value received, I promise to pay you, or your order, at your address listed above the PRINCIPAL sum of FIVE HUNDRED THOUSAND AND NO/100 Dollars $500,000.

Note 1 reflects that ATI received $79,300.00 as the first advance on August 20, 1997. It was a demand note. If no demand was made, then interest was payable quarterly, and the principal was due August 20, 1998.

Luckie was not only acting on behalf of ATI as its secretary; he also executed some of the documents on behalf of Escalante as Escalante's attorney-in-fact. Escalante testified that he and Luckie had known each other for 30 years and that they had been involved in numerous business transactions with each other. On August 20, 1997, Luckie, as Escalante's attorney-in-fact, pledged Escalante's $274,511.06 CD No. 10038570 to MainBank as security for Note 1 and "all extensions, renewals, modifications and substitutions." The record contains both the assignment by Escalante of the CD to MainBank and the separate endorsement on the CD that

states that the CD was "being held at MainBank as collateral on loan in name of American Teletronics Inc." Myers and Luckie both testified that Escalante pledged his CD to secure Note 1.

Escalante also introduced into evidence guarantee agreements dated August 14, 1995, that were executed by Myers and Luckie. The first paragraph of the guarantee agreements states that:

The Undersigned, [Luckie][Myers], a shareholder of American Teletronics, Inc., hereby unconditionally guarantees payment and performance of all obligations of American Teletronics, Inc. to Jorge A. Escalante arising under or related to the Collateral Accommodation Agreement, attached hereto (the "CA Agreement") and the Undersigned unconditionally agrees to indemnify and hold harmless Escalante from any and all claims, actions, or causes of action, losses or expenses that he may suffer or incur because or by reason of his pledge of his $250,000 certificate of deposit to MainBank to secure the payment and performance of the obligations of American Teletronics, Inc.'s to MainBank under a letter of credit issued to Continental Casualty Company and/or Transportation Insurance Company and/or Transcontinental Technical Services, Inc.; *provided, however,* the liability of the Undersigned is limited to [10 percent in the case of Luckie and 30 percent in the case of Myers] of the total liability of American Teletronics, Inc., to Escalante. (Emphasis in original)

The Collateral Accommodation Agreement (the CAA), also dated August 14, 1995, between ATI and Escalante sets forth why Escalante pledged his $250,000.00 CD to MainBank. ATI wanted to have the use of $420,000.00 of its $2,100,000.00 worker's compensation insurance deposit with Continental Casualty Company (Continental). Continental required a one-year letter of credit from MainBank to make certain that the $420,000.00 was repaid. ATI did not have sufficient unencumbered assets acceptable to MainBank to adequately collateralize ATI's $420,000.00 liability to MainBank that would arise out of MainBank's issuance of the letter of credit to Continental. Escalante agreed to pledge his $250,000.00 CD to secure ATI's liability to MainBank to induce MainBank to issue its letter of credit to Continental. In the CAA, ATI agreed that it would "immediately pay MainBank any amounts MainBank pays under [the letter of credit to Continental]."

In its findings of fact, the trial court found that Escalante is the current owner and holder of Note 1; that Escalante paid MainBank $274,511.06 for Note 1 and used the proceeds of a $274,511.06 CD No. 10038570 to do so; and that, under the terms of an Individual Guaranty, Indemnity, Stock Pledge and Security Agreement dated August 14, 1995, Escalante pledged a $250,000.00 CD to secure the payment and performance of the obligation of ATI to MainBank under the letter of credit issued to Continental. In its conclusions of law, the trial court held in part:

1. [Escalante] failed to prove by a preponderance of the evidence that the $274,511.06 C.D. dated August 20, 1997, was in any way related to the $250,000 C.D. dated August 14, 1995, and which was the subject matter of the Individual Guaranty, Indemnity, Stock Pledge and Security Agreements executed by D.D. Luckie and Harry K. Myers [on August 14, 1995].

2. [Escalante] failed to prove by a preponderance of the evidence that the $250,000 C.D. identified in Exhibits 3 and 4 was lost or forfeited in con-

nection with the payment and performance of the obligations of [ATI] to Main Bank under the Letter of Credit issued by [Continental].

5. [Escalante] failed to prove by a preponderance of the evidence the amount of money advanced on the Line of Credit Note (Note 1).

6. [Escalante] failed to prove by a preponderance of the evidence the amount of principal and interest owed by [ATI] on Note 1.

■ An assignee of a note seeking to recover for the breach of a guarantee agreement regarding a note must establish: (1) the existence and ownership of the guarantee agreement; (2) the terms of the underlying contract by the holder; (3) the occurrence of the conditions upon which liability is based; and (4) the failure or refusal to perform the promise by the guarantor. *Marshall v. Ford Motor Company*, 878 S.W.2d 629, 631 (Tex.App.-Dallas 1994, no writ); *Wiman v. Tomaszewicz*, 877 S.W.2d 1, 8 (Tex.App.-Dallas 1994, no writ).

■■ Escalante established his ownership of the 1995 guarantee agreements from Luckie and Myers. The existence and ownership of a note may be established by proof that the plaintiff is the named payee, that plaintiff had possession of the note and produced it in court, and that the court admitted it into evidence. See *Schubiger v. First Newport Realty Investors*, 601 S.W.2d 218, 222 (Tex.Civ. App.-Dallas 1980, writ ref'd n.r.e.). We hold that the same is true in proving ownership of a guarantee. Luckie and Myers introduced no evidence.

In their 1995 individual guarantee and indemnity agreements, Luckie and Myers agreed to indemnify and hold harmless Escalante:

[F]rom any and all claims, actions, or causes of action, losses or expenses that he may suffer or incur because or by reason of his pledge of his $250,000 certificate of deposit to MainBank to secure the payment and performance of the obligations of American Teletronics's, Inc. to MainBank under a letter of credit issued to Continental Casualty Company.

The question is whether Escalante established that the conditions referred to did occur and, therefore, Luckie and Myers became liable to Escalante under their 1995 guarantee agreements.

At trial, Escalante testified that Luckie delivered his 1995 individual guarantee and indemnity agreement to Escalante and that this document was provided or delivered to Escalante in connection with his pledge of the $274,511.06 CD dated August 20, 1997. Escalante testified that ATI failed to pay the 1997 Note 1 to MainBank; that MainBank required him to cash his $274,511.06 CD to pay MainBank $223,177.70, the amount of principal that was due MainBank on November 23, 1998;[1] and that, for paying the principal and interest due on November 23, 1998, MainBank endorsed Note 1 to Escalante. When Escalante testified that Luckie owed him $24,811.08 under his 1995 guarantee and that Myers owed him $74,433.23 under his 1995 guarantee, it was apparent that Escalante was basing his calculations on his assumption that MainBank's forcing him to cash his 1997 CD to pay $223,177.70 was the occurrence of the condition in the 1995 guarantee agreements of Luckie and

---

1. Escalante testified that he also had to pay interest on the $223,177.70 that was due on November 23, 1998.

Myers that he suffer a loss by reason of his pledge of his $250,000.00.

The only evidence that the 1995 guarantee agreements were related to the pledge of the 1997 CD was Escalante's brief statement that Luckie delivered his 1995 guarantee agreement in connection with Escalante's pledge of his 1997 CD. Escalante provided no proof that his CD pledged in 1995 was related to the pledge of his 1997 CD. There is no evidence that the line of credit for $500,000.00 in Note 1 was related to ATI's obligation to MainBank for $420,000.00 in 1995. The fact that Note 1 recites that the first advance under Note 1 was $79,300.00 indicates that Note 1 and the earlier $420,000.00 obligation were not connected. From this fact alone, the trial court could infer that Note 1 and the $420,000.00 obligation in 1995 were not connected.

Even if CD No. 10038570 was a renewal of the 1995 CD or was the same CD with accumulated interest, Luckie and Myers limited their 1995 guarantee to Escalante's pledge of a $250,000.00 CD to secure ATI's obligation to MainBank in connection with MainBank's issuance of a letter of credit (the Main LC) to Continental. The 1995 guarantee agreements of Luckie and Myers state that they were guaranteeing payment and performance of all obligations of ATI to Escalante arising under or related to the CAA. The CAA provided specifically that:

> The term of Escalante's pledge of his $250,000 C.D. shall expire one year from the date of the Main LC (the "Term") and Escalante shall be entitled to receive his $250,000 C.D. at the end of the Term. *The $250,000 C.D. shall not secure any other obligations or liabilities of ATI to MainBank.* (Emphasis added)

Escalante provided no evidence that his $274,511.06 CD secured ATI's obligation to MainBank under the CAA.

■ A guarantor is entitled to have his agreement strictly construed, and it may not be extended by construction or implication beyond the precise terms of his contract. *McKnight v. Virginia Mirror Company,* 463 S.W.2d 428, 430 (Tex.1971). Escalante failed to provide evidence demonstrating that Luckie and Myers breached the terms of their 1995 guarantee agreements.

### *Note 2—$175,790.00 Loan Amount*

■ The $175,790.00 note, dated August 24, 1998, was payable to MainBank. Note 2 was also executed by Myers, as chairman, and Luckie, as secretary, on behalf of ATI. Myers and Luckie executed their guarantees of Note 2 to MainBank on the same day. Although it found that Escalante was the owner and holder of Note 2, the trial court found that Escalante did not prove that he was the owner and holder of Luckie's guarantee of Note 2 or that he was the owner and holder of Myers's guarantee of Note 2. The trial court further concluded that Escalante failed to prove by a preponderance of the evidence the amount of principal and interest due on Note 2 or that the CD pledged to secure Escalante's obligation to MainBank was foreclosed upon. Note 2 provides that both interest and principal were payable on demand; but, if the bank made no demand, then both interest and principal were due December 30, 1998. The trial court found that Escalante made no demand on either Luckie or Myers.

■ The testimony of Escalante, Luckie, and Myers fully proved the execution of Note 2 and the guarantee agreements of Luckie and Myers. Neither Luckie nor Myers denied under oath the execution of their guarantee agreements or the execu-

tion of Note 2. When a claim is based on the execution of a written instrument and the defendant does not deny under oath the execution of the instrument, "the instrument shall be received in evidence as fully proved." TEX.R.CIV.P. 93(7); *Hanks v. NCNB Texas National Bank,* 815 S.W.2d 763 (Tex.App.-Eastland 1991, no writ).

 Texas recognizes that there can be an implied transfer of a guarantee when the promissory note is assigned. *Ray v. Spencer,* 208 S.W.2d 103 (Tex.Civ.App.-Texarkana 1947, writ ref'd); see *Boyd v. Diversified Financial Systems,* 1 S.W.3d 888 (Tex.App.-Dallas 1999, no pet'n); *Vaughn v. DAP Financial Services, Inc.,* 982 S.W.2d 1 (Tex.App.-Houston [1st Dist.] 1997, no pet'n). *Ray v. Spencer, supra,* held that there can be an implied assignment of a guarantee supported only by the assignment of the promissory note. The court in *Boyd v. Diversified Financial Systems, supra,* also found that there had been an implied assignment of the guarantee with the promissory note. The *Boyd* court, however, first found that the loan sale agreement between the Federal Deposit Insurance Corporation and Diversified Financial Systems provided that the FDIC was selling Diversified all "Loans," and the agreement defined "Loans" as including the rights of the FDIC under collateral documents which included any personal guarantee. Thus, the *Boyd* court held that there had been an implied assignment; a formal assignment was not required. There appears to have been no document transferring the guarantee from the FDIC to DAP Financial Services, Inc., in *Vaughn;* yet the court found that, based on a witness's testimony, the guarantee was transferred.

Under the facts of this case, we find that there was an implied assignment of the guarantee agreements to Escalante when MainBank endorsed Note 2 to Escalante. Luckie and Myers signed guarantee agreements that contemplated MainBank assigning Note 2. Their guarantees were absolute guarantees of payment, not of collection. See *Universal Metals and Machinery, Inc. v. Bohart,* 539 S.W.2d 874 (Tex.1976)(guarantor liable on his guarantee of payment even though the maker's signature is a forgery); *Ford v. Darwin,* 767 S.W.2d 851 (Tex.App.-Dallas 1989, writ den'd). In their guarantee agreements, Luckie and Myers agreed:

> For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce MAINBANK N.A., RED OAK, TX. (herein, with its participants, *successors and assigns,* called "Lender"), at its option, at any time or from time to time to make loans or extend other accomodations to or for the account of AMERICAN TELETRONICS INC. (herein called "Borrower") or to engage in any other transactions with Borrower, the Undersigned hereby absolutely and unconditionally guarantees to Lender the full and prompt payment' when due, *whether at maturity or earlier by reason of acceleration or otherwise,* of the debts, liabilities and obligations described as follows:
>
> A. [T]he Undersigned guarantees to Lender the payment and performance of the debt, liability or obligation of Borrower to Lender evidenced by or arising out of the following: $175,790.00 NOTE DAT (sic) 8/24/98 WITH ACCRUED INTEREST AT 6.80% and any extensions, renewals or replacements thereof (hereinafter referred to as the "Indebtedness"). (Emphasis added)

The endorsement by MainBank to Escalante of Note 2 "specifically grants to [him] the right and power to collect all monies

due." This would include monies due to MainBank under the guarantees of Luckie and Myers, and MainBank delivered the guarantees to Escalante when it endorsed Note 2.

Myers testified that ATI did not pay the amount due under Note 2 because "[i]t didn't have the money" and that he failed to pay anything under his guarantee of Note 2 because he didn't have the money. Myers further stated that there was no other reason why he failed to pay anything under his guarantee. Luckie also testified that ATI had not repaid the $175,790.00, that Escalante had pledged a CD to secure Note 2, and that Luckie had made no payment under his guarantee of Note 2. Luckie further testified that he understood that MainBank had assigned Note 2 to Escalante.

Luckie and Escalante had been involved in various business transactions for over 30 years. As mentioned earlier, Luckie acted as Escalante's attorney-in-fact in pledging Escalante's CD in connection with Note 1.

According to Escalante, ATI had advised him that it was not going to be able to pay the $175,790.00 obligation to Main-Bank. Escalante testified that MainBank had endorsed Note 2 to him on November 23, 1998, and that, at the same time, he received possession of Luckie's and Myers's guarantees of Note 2. Escalante said that he had pledged CD No. 31041365 in the amount of $175,790.00 to secure Note 2. Escalante testified that he had to cash CD No. 31041365 to acquire Note 2 and that he paid MainBank $175,790.00 plus some interest to acquire Note 2.

Escalante was not required to make demand of ATI before proceeding against Luckie and Myers. *Universal Metals and Machinery, Inc. v. Bohart, supra* at 877–78. The guarantee agreements are com-prehensive, and Paragraph No. 11 specifi-cally states that lender[2] did not have to first resort to ATI for payment before enforcing the guarantees. Nor was Esca-lante required to first make demand of Luckie and Myers on their guarantee. Luckie and Myers were the officers of ATI. They testified that ATI did not have the money to pay MainBank. They agreed in Paragraph No. 2 of their guaran-tee agreements that "[n]o act or thing need occur to establish the liability of the Undersigned hereunder." No purpose would have been served by Escalante mak-ing a formal demand on Luckie and Myers. MainBank endorsed Note 2 to Escalante on November 23, 1998. Note 2 was a demand note; and, even if no demand, interest and principal were absolutely due on December 31, 1998. Escalante filed this suit February 22, 1999.

■ The assignment of a note does not automatically assign an underlying guaran-tee in every case. For example, the court in *Ashcraft v. Lookadoo*, 952 S.W.2d 907 (Tex.App.-Dallas 1997), *pet'n den'd per cu-riam*, 977 S.W.2d 562 (Tex.1998), discussed at length why it found that there had been no implied assignment. In examining the facts, the court noted that the guarantee was not in the asset file with the note that was conveyed, that the assignee did not possess the guarantee, that the assignee could not produce the original guarantee, and that the assignee could not prove that the defendant had ever signed the guaran-tee. The court pointed out that the copy of the guarantee was not specific to the note in question, and the assignee pro-duced no evidence that the transferor of the note ever owned a valid guarantee capable of being assigned. Thus, the ap-pellate court found that those facts sup-ported the trial court's finding that the

---

**2.** Lender is defined in the guarantee as being MainBank, its successors, and assigns.

assignee failed to prove that he was the owner of the guarantee.

The court in *Cadle Company v. Regency Homes, Inc.*, 21 S.W.3d 670 (Tex.App.-Austin 2000, pet'n den'd), found that it was not necessary to imply a transfer of the guarantee with the note because:

Cadle possessed and presented to the court the original guaranty, which Rutland [the guarantor] acknowledged having executed. The language of the guaranty specifically stated that it guaranteed all of Regency's existing or future indebtedness to the bank and was intended to benefit any assignee of the original bank. Finally, the loan sale agreement specifically conveyed to Cadle all collateral documents, which included personal guaranties.

■ Escalante conclusively established that he owned the guarantees of Luckie and Myers. There was an implied assignment of their guarantees with Note 2. *Ray v. Spencer, supra.* The trial court also erred in concluding that Escalante failed to prove by a preponderance of the evidence the amount of principal and interest due on Note 2. Escalante's possession of Note 2, Luckie's and Myers's acknowledgment that they executed Note 2 and their guarantees, Luckie's and Myers's testimony that ATI did not pay Note 2 and that they did not pay anything pursuant to their guarantee agreements, and the fact that Note 2 was not marked paid constituted proof that Note 2 remained unpaid. *Cadle Company v. Regency Homes, Inc., supra* at 675. Payment is an affirmative defense. TEX.R.CIV.P. 94. The burden was on Luckie and Myers to plead and provide evidence that Note 2 had been paid in whole or in part. Neither Luckie nor Myers raised the affirmative defense of payment, and they provided no evidence that Note 2 had been paid.

■ Finally, the trial court erred in concluding that Escalante failed to prove that MainBank foreclosed on his CD. Escalante was not required to provide this proof. The guarantee agreements of Luckie and Myers guaranteed the payment of Note 2 to MainBank or its assignee. Escalante could have been an unrelated third-party purchaser of Note 2 and the guarantee agreements, and he would be entitled to enforce the guarantee agreements.

### Note 3—$150,000.00 Loan Amount

Note 3 was dated August 3, 1998, payable to MainBank. It was executed by Myers, as president, on behalf of Bent Tree Group, Inc. Note 3 was payable upon demand; but, if the bank made no demand, then both interest and principal were due on December 30, 1998. MainBank endorsed Note 3 to Escalante, and the trial court found that Escalante owned Note 3. In its findings of facts, the trial court mistakenly stated that ATI executed Note 3. Note 3 reflects that the maker was Bent Tree Group, Inc., and Myers testified that the maker was Bent Tree Group, Inc. The trial court also found that Escalante was the owner and holder of the Guaranty Agreements dated August 13, 1994, executed by Luckie and Myers. Despite finding that Escalante owned Note 3 and the guarantees, the trial court then erroneously concluded that Escalante failed to prove by a preponderance of the evidence: that Escalante was obligated to MainBank for payment of Note 3; the amount of principal and interest due on Note 3; and that collateral pledged by Escalante to secure Note 3 was foreclosed on. The trial court also found as a fact that Escalante did not make a demand for payment on Luckie and Myers.

The guarantee agreements of Luckie and Myers read:

In consideration of the sum of One Dollar to me paid by Jorge A. Escalante (hereinafter called the Collateral Provider), the receipt whereof is hereby acknowledged, and further in consideration of the credit given and hereafter to be given by MainBank—Red Oak, Texas (hereinafter called MainBank) to Bent Tree Group, Inc. (hereinafter called the Debtor), *I hereby guarantee to the Collateral Provider*, its assignees and transferees, *the payment at maturity of all promissory notes, certificates of deposit, checks, drafts, acceptances, overdrafts and other indebtedness of whatsoever nature upon or for which the Collateral Provider is or may hereafter become obligated to MainBank*, whether as maker, acceptor, drawer, endorser, guarantor, surety or otherwise, *and all notes* or other evidences of indebtedness or liability heretofore or hereafter purchased or *acquired from said Debtor by said MainBank and endorsed by said MainBank, with or without recourse*, whether said notes or other evidences of indebtedness or liability so made or so incurred or so purchased and acquired be retained by said MainBank or transferred before or after maturity, with or without recourse.

I waive notice of acceptance of this guaranty by the Collateral Provider as to present and future obligations, indebtedness and liability of the Debtor to MainBank of the character aforesaid; *and I waive presentment, demand,* protest, notice of protest and *notice of dishonor* as to each and all items constituting the indebtedness or obligation hereby guaranteed. No renewal or extension of the time of payment of any such item shall affect my liability hereunder, whether made before or after written notice of revocation of this guarantee is given. (Emphasis added)

In the third paragraph of their guarantee agreement, Luckie and Myers further agreed:

I authorize the Collateral Provider to forward any and all collateral which it may from time to time hold as security for the indebtedness hereby guaranteed, to the Debtor for collection and remittance or for credit. I agree that no exchange, release or surrender of any such collateral and no release or discharge of any party liable thereon shall affect my liability on this guaranty.

Myers testified that Bent Tree was out of business and ceased operations in the summer of 1999. Myers also testified that Bent Tree Group, Inc. did not pay sums due under Note 3 because it did not have the money and that he failed to pay anything under his guarantee because he did not have the money. Myers further stated that there was no other reason why he failed to pay Escalante anything under his guarantee. Escalante testified that he pledged his CD No. 31041366 in the amount of $150,000.00 to secure Note 3. Escalante further testified that he had to cash that CD to pay the bank; in addition to the $150,000.00, he also had to pay some interest. Escalante confirmed Myers' testimony that $150,000.00 was still due under Note 3; he further stated that through July 25, 2000, the interest due amounted to $21,560.47. The Guaranty Agreements limited Luckie's and Myers's guarantees to $30,000.00 each. Escalante testified that, as of July 25, 2000, they each owed him $30,000.00 plus $4,312.09 interest.

■ Escalante's possession of Note 3, Myers's acknowledgment that he executed Note 3 as president of Bent Tree, and the fact that Note 3 was not marked paid constituted prima facie proof that Note 3 remained unpaid. TEX. BUS. & COM. CODE ANN. § 3.308 (Vernon Supp.2002); *Cadle Company v. Regency Homes, Inc.*,

*supra* at 675; *Prudential Securities, Inc. v. Haugland*, 973 S.W.2d 394, 399 (Tex. App.-El Paso 1998, pet'n den'd); *Schlager v. Harris*, 805 S.W.2d 893, 894 (Tex.App.-Corpus Christi 1991, no writ). Myers and Escalante both testified that nothing was paid on Note 3. Myers testified that the only reason that he did not pay Escalante under his guarantee agreement was that he did not have the money. It was the obligation of Luckie and Myers to show repayment of Note 3; Escalante presented prima facie and actual proof that Note 3 was unpaid. Again, neither Luckie nor Myers raised the affirmative defense of payment. See *Cadle Company v. Regency Homes, Inc.*, *supra* at 675. The prima facie proof that Note 3 was unpaid and the testimony of Myers and Escalante conclusively established that Note 3 was unpaid.

Although the trial court concluded that Escalante failed to show that he was obligated to MainBank, the guarantee agreements themselves stated that Luckie and Myers guaranteed to Escalante "the payment at maturity of all promissory notes, certificates of deposit ... upon or for which [Escalante] is or may hereafter become obligated to MainBank." Escalante testified that he had to cash CD No. 31041366 to pay the $150,000 to MainBank. He sued Luckie and Myers after December 30, 1998, the maturity date of Note 3. Note 3 was "acquired from said Debtor [Bent Tree] by said MainBank and endorsed by said MainBank ... without recourse" to Escalante. Escalante introduced the testimony of Myers that the only reason that he did not pay Escalante on his guarantee was that he did not have the money. Luckie and Myers introduced no evidence to the contrary. Finally, there was no requirement that Escalante make a demand on Luckie and Myers. Both Luckie and Myers specifically waived demand in their guarantee agreements.

The trial court did not err in granting judgment to Luckie and Myers on their 1995 guarantee agreements to Escalante because Escalante did not prove that they breached their agreements in connection with Note 1. The trial court erred in failing to grant Escalante judgment against Luckie and Myers on their guarantees of Notes 2 and 3. Under Paragraph 13 of their guarantee agreements, Luckie and Myers were jointly and severally liable to Escalante for the payment of Note 2. They each owed $30,000.00 under their guarantee agreements relating to Note 3.

### Attorney's Fees

In his final issue, Escalante asserts that the trial court erred in failing to award him attorney's fees under the provisions of Luckie's and Myers's guarantee agreements. The trial court concluded that Escalante was not entitled to attorney's fees because he had not made a demand upon or presented the claims to Luckie or Myers. See TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001 & 38.002 [3] (Vernon 1997). Escalante does not contend on appeal that he presented the claims but, rather, that he was not required to present the claims because presentment was waived by the guarantee agreements.

In Texas, attorney's fees are authorized only when provided for by statute or by contract between the parties. *Travelers Indemnity Company of Connecticut v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996). In his pleadings, Escalante requested attorney's fees pursuant to the Texas Civil Practice and Remedies Code and also

---

**3.** Section 38.002 provides in part: "To recover attorney's fees under this chapter ... (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party."

pursuant to the terms of the agreements. The guarantee agreements covering Notes 2 and 3 expressly provide for the recovery of attorney's fees and for the waiver of presentment. The guarantee agreements signed by Luckie and Myers with respect to Note 2 read in relevant part:

I waive presentment, demand, protest, notice of protest and notice of dishonor as to each and all items constituting the indebtedness or obligation hereby guaranteed.

\* \* \*

In case of default in the payment of any indebtedness or liability guaranteed hereby, there shall be added to such indebtedness or liability, and we will pay, all expenses, costs and attorneys fees incurred by the Collateral Provider either in collecting or attempting to collect the same or any sums payable hereunder.

With respect to Note 3, the guarantee agreements read in relevant part:

The Undersigned [Luckie and Myers] will pay or reimburse [MainBank, its successors, and assigns] for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by [MainBank, its successors, and assigns] in connection with the protection, defense or enforcement of this guaranty in any litigation.

\* \* \*

The Undersigned waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing indebtedness.

■ We hold that, pursuant to the express terms of the guarantee agreements, Luckie and Myers waived presentment and demand of Escalante's claims against them and that they agreed to pay attorney's fees. Therefore, the trial court

erred in concluding that Escalante was not entitled to attorney's fees.

Escalante's counsel testified that Escalante had incurred reasonable and necessary attorney's fees of $19,547.50 through trial; that it would be impossible to separate the work done on any specific note or claim asserted by Escalante because the claims were interrelated; that Escalante would incur $1,000.00 additional attorney's fees if a motion for new trial were filed; that a reasonable and necessary attorney's fee for an appeal to the Texas Court of Appeals would be $3,500.00; that, if a petition is filed but not granted by the Texas Supreme Court, a reasonable and necessary attorneys' fee would be $2,500.00; and that, if the Texas Supreme Court grants the petition, a reasonable and necessary attorney's fee would be $3,000.00. Luckie and Myers did not challenge this testimony nor did they introduce any evidence. In addition to this appeal, Escalante did file a motion for new trial. The trial court should determine whether the attorney's fees were reasonable and necessary.

*This Court's Ruling*

We affirm the trial court's judgment that Luckie and Myers owe nothing on their guarantee agreements dated August 14, 1995, because there was no evidence that their guarantee agreements and Note 1 were related. We reverse and render judgment that Escalante recover the unpaid amount of $175,790.00 on Note 2 against Luckie and Myers, jointly and severally, on their guarantees of Note 2. We reverse and render judgment that Escalante recover $30,000.00 from Luckie and $30,000.00 from Myers on their guarantees of Note 3. We reverse and render judgment that Escalante is entitled to attorney's fees. We reverse and remand for

further proceedings pursuant to this opinion, including the calculation of interest and the determination by the trial court of the amount of reasonable and necessary attorney's fees to which Escalante is entitled.